Please be seated. It's hard to pack up, isn't it, Mr. Ross? Thank you. Proceed in our final case, United States v. Charlie Wayne Bryant. Ms. Popkin-Bradley Good afternoon, judges. Of course, my name is Cindy Popkin-Bradley, and I represent Charlie Bryant, the appellant. His case is from the Western District of North Carolina, out of Charlotte. I am from the Eastern District of North Carolina on the panel there, and this is my first argument before this court. Mr. Bryant is a man without a country. He's a man without rights, and he's mentally ill, and he's trying to get some help. He goes to the first hospital. He doesn't get any medicine. He takes Depakote. He leaves there. He next calls the suicide hotline. He can't get any help there. And so he goes, but they tell him, go back to a hospital. So he goes to another hospital. He's admitted. He talks to a doctor. He thinks he's going to get the 2,000 milligrams of Depakote that he needs twice a day, or 1,000, excuse me. But instead of that happening, a nurse discharges him about a half an hour later and tells him to get off the hospital grounds. At that point, you know, here's a man who knows he has bipolar disorder and some other mental health issues. He needs medicine. He doesn't have anywhere to get it. He, once he gets, once the nurse calls the police and asks him off the grounds and he gets arrested by the police, he goes downtown, the magistrate processes him, and instead of really keeping him, he decides to release him on his own recognizance. And then Mr. Bryant has to spend the night outside all night long. I don't mean to interrupt you now, but let me ask you, if you could, before you go into your facts, to give us the legal framework of your argument here. Are you saying that the trial court abused its discretion in not allowing him to withdraw his plea, that the court erred in any respect with regard to failing to make a competency determination? Give us the legal framework, and I think that will help us listen to your argument better. I apologize, Your Honor. No, that's okay. Actually, I was going to use my second argument. I had two issues in the brief. The one was the withdrawal of the guilty plea. I don't concede that, but I really wanted to focus, unless the court wants to talk about the motion to withdraw, I don't want to concede that, but I wanted to rely on my brief, and I really wanted to talk about the guideline sentencing issue with respect to the aggravated assault. I think there I can be most effective, and I think in all reality, because this man has been in the system now for two and a half years and he's gotten a 130-month sentence, he comes back and he's able to start all over. He's got another big problem. So you're going to focus on the sentencing argument here? Yes. That seems to be the strongest thing you've got here. Yes. So what I see here is that- What was the charge he pled guilty to? He pled guilty to intimidating the indictment, forcible assault, resist, oppose, impede, intimidate, interfere with a government official, and it does say inflicting bodily injury, 18 U.S.C. section 111A1 and B. And it says nothing about a dangerous weapon. No. But the PSR, what I'm having some interest in, it's interesting to me, if you look at the PSR, it looks like to me that's what he starts with. It's a whole different charge, but the dangerous weapon one, that's not what he pled guilty to. Right. And that's what I think is the problem with Judge Cogburn's sentence here. When you start looking at when the sentencing starts, Judge Cogburn immediately says, wow, this is a lot of time for a busted lip. And he's trying to tell the U.S. attorney that, you know, what do we have here? And he says, you know, I've seen cases like this before in, I guess, before he was a district court judge. He said where the law enforcement starts up with an individual who has issues and, you know, then they turn around and charge them with assault on a government official when it's really a restraint or an impeding. And so what happens, I think, is that, well, there are a number of things, and I'm trying to whack through this so that I won't complicate this for you. Well, you seem to indicate that the guideline 2A.2.4 is what the judge should have used instead of 2A.2.2. Yes, that's correct. And it all centers around this weapon and the issue of whether it was being used. Right. And Judge Cogburn never discussed the weapon was really not a part of the sentencing hearing until the very end. Now, the government brought it up. But, Judge, it was never, the weapon was never a part of what he was being punished for. And when you look throughout the whole sentencing transcript, you know, he talks about, I mean, they got into some sort of fracas that did not. Did he tell somebody that he was trying to get the gun so he could? He did, but, you know, what that was later on. He said, I was trying to grab his Glock but couldn't get it out. My intentions were to kill him because he was beating me. And isn't the court entitled to consider all the relevant conduct in sentencing pursuant to Guidelines 1B.1.3 and also 2A.2.4, which provides a cross-reference? Yes, Your Honor. But if you look at how this came about and how Judge Cogburn conducted the sentencing hearing, this thing about the Glock never came up until after he had already been through this whole night of trying to go to the hospital, going through the, getting arrested down at the Social Security Administration. This is later on after his arrest when the man's still, he's tired, he's exhausted, he's mentally ill. And even Judge Cogburn says in the appendix at pages 177 through 174, he tells the U.S. attorney, you know, this is what, he says, he didn't bring a weapon in. He didn't bring in a firearm. He didn't bring in a knife. It started out as a shoulder thing with a push. So Judge Cogburn considered all of that in his sentencing? He did. He did. He considered all of that, and he said none of that, the gun was not a part of it. And he says there was a lot of swinging and there was shooting off of his mouth, and he talked about President Clinton and President Obama during that debrief where he said I would have shot him if I had gotten the Glock. And Judge Cogburn is saying this is what mentally ill people do. Okay. But the sentencing guideline talks about involving a dangerous weapon, does it not? Assaults that involve a dangerous weapon with intent to inflict bodily injury. What does the word involve mean? This is the guidelines note. Aggravated assault. That's exactly right, Your Honor. Right. Isn't that sort of the crux of what we've got to decide here? What is involvement with a dangerous weapon for purposes of application of this guideline section? Why aren't the defendant's statements enough to make this involving a weapon? And it also, not to interrupt you, but it talks about serious bodily injury, and I also point out here that I believe that if it's bodily injury, it's not serious bodily injury. But he said he intended to kill him. Well, that was later after. I do realize what he said, Your Honor, but he's a mentally ill man who has been through this whole extraordinary experience, and he's frustrated, and it doesn't go with the facts of what happened. There's no question this is a square peg in a round hole case. I mean, it's tragic. It's really terrible. I agree with you with that, the thought of this person being incarcerated for as long as he is. But we've got to analyze the sentencing. The gun, he says that, that he had his hand on the holster. All the credible testimony at sentencing or the testimony by anyone throughout the transcript, the gun was never, he never had any possession of the gun. He never had control of the gun. I believe when he went for the gun, that's when one of the fellows came in, another worker, and pulled the asp out and gave it to Siegel to beat him with the asp or the baton, whatever you call it. And I know there was some, one of the SSA workers said something like, well, you know, if he doesn't calm down or start behaving, maybe you should use your firearm. But what I would say to the court is that there isn't any evidence that he actually had the gun or possession of the gun or was going to use the gun during. There is evidence that he was going to use the gun. He said he was, if he could get a hold of it. And did the court really need to wait for him to get a hold of the gun to apply a guideline that says if the assault involved a dangerous weapon with intent to cause bodily injury? I just don't think that he did not have the gun. He did not intend to do, I mean, he was on his way out the door. If you look back at what was going on before this officer came up to him, and we can't know because, you know, I wasn't there. But it looks to me that, and the officer even says that he pushed him in the bathroom. It looks like my client was on the way out the door. And so it doesn't look like any intent to do that. And we have an officer who is, you know, grossly overweight, who's suffering from post-traumatic stress disorder, who is trying to keep things in order. And I realize that that's not what you're dealing with, but that's what happened to my client. He was being taken over by somebody who probably is maybe equally ill as him. You know, because he says, as Officer Siegel says in here, you know, it caused my post-traumatic stress to come back, and I felt like I was in war with him, and I was protecting the people. And I just, I don't think that Judge Cogburn found that there was a gun. I mean, he specifically says here that he didn't consider the gun in pages 173 through 175, and he's telling the U.S. Attorney, I'm not going to give him a lifetime sentence when nobody was shot at, stabbed, or, you know. And then he goes on to say, I don't know what would have happened with regard to the firearm as if he would have gotten it. So, to me, it's clear that the court found that there was no gun involved in this. There was no gun used. Isn't that really? No gun used, but my client didn't have, he didn't possess the gun. He touched it. He didn't get it. He says he touched the holster or top of the holster. Excuse me. I guess there are some things that we don't know, and we don't know, I guess, the gun's on the back and it's in a holster, what you have to do to get it out of a holster. Whether it's even, there's not even any evidence whether it was even loaded. I mean, sure, you can take a gun and you can strike somebody in the head with it and hurt them that way, and it can be a dangerous weapon. But a lot of times service, this is not in the record, but I'm just saying from the world view that service police officers or contract workers or he wasn't an actual full-time employee with the Social Security Administration there. They have their clip somewhere else so that someone doesn't grab their gun and start shooting. And those are things that we don't know. You know, I go back to that I don't think, excuse me, not that I don't think, the evidence does not show that my client was involved with a gun, that he had the gun and could have done anything. I know what he said, but I don't think that's enough when you have a mentally ill man who is also talking about that he doesn't like President Obama and he doesn't like Clinton. And, you know, he was angry. He didn't get his checks and he wanted his medicine and he was screaming at him, what does it take an act of Congress to get some medicine around here? So I don't want to belabor it, but I don't think that he had a gun and I think that it needs to be remanded back to the District Court. He needs to be sentenced under 2A2.4. Okay, thank you. Mr. Miller? May it please the Court, William Miller on behalf of the United States. The District Court acted within its discretion when it denied the defendant's motion to withdraw his guilty plea and did not commit procedural error at sentencing. And for those reasons, this Court should affirm the judgment of the District Court. There's one thing I want to make clear right out of the gate here. The appellant says in its brief that the gun issue was raised for the first time in the response that that's not what it was about below. That assertion is directly contradicted by the record. I would refer the Court to page 223, which is the defendant's objections to the pre-sentence report. And in paragraph 19 of those objections, the defendant at the District Court talks about why 2A2.2 should not apply for the base offense level. And it mentions in there that the defendant never brandished, possessed, or pointed the firearm, which remained at all times in the officer's holster. And so from the very beginning with the District Court, the calculation of the guidelines and the application of 2A2.2 was based on the involvement of the firearm. That was the party's understanding. That's the argument the government responded to below. And that's the findings that the District Court adopted when it adopted the pre-sentence report. What did the defendant plead guilty to? The defendant pled guilty in the indictment alleged bodily injury, which is what's required for the enhanced penalty under Section 111B. But it said nothing about a dangerous weapon. And then the PSR report kind of puzzles and starts right out with it. Dangerous weapon with intent to cause bodily injury. That's correct, Your Honor. Here, the fact that triggered the... Where does that come from on the PSR? I mean, how do you put a different charge when you start out than what he actually pled to? Even if you've got evidence that comes in, how do you start out with a totally different charge than what he pled with? I can't explain the probation officer's use of the heading, but... The defendant objected to it. I don't know if there's ever a ruling in terms of the objection of that. There is certainly a... It's puzzling that you would start out with something there. I mean, that takes it in a whole different ballgame. And it's the direction that the parties knew and expected it would go as the objections to the precedence report bear out. So this whole case, it seems like to me, just comes down. You narrow this thing. I mean, we can talk about his mental illness and all the other things that are there. But it really comes down to this issue of whether .2 or .4 operates here. And whether... Is it the strongest thing, his statement, that I was trying to get his glock and use it? Is that the evidence that you rely on here? The evidence... Statements that occurs after this all goes down. No, Your Honor. That's certainly important, the defendant's statement of his intent. But we have every eyewitness who was in that bathroom testify to the same thing. And that's that the defendant made repeated attempts to grab Officer Siegel's firearm. There were two SSA employees in the bathroom there, and they both testified consistently that it was their distinct impression that in this scuffle they saw the defendant go for that firearm. And Officer Siegel says that the defendant worked his way up the holster and actually had his hand on the end of the gun. And so that evidence is strong evidence that this involved a firearm. And then the fact that the defendant comes in later and says, I intended to use it to kill the man, that just tightens it up. I mean, I think that... So the defendant actually put his hands on the glock, touched it. That was the testimony of Officer Siegel, yes, Your Honor. And to address your first point about the statutory issue and what triggered the higher statutory maximum in this case versus the application of the guidelines, Section 111B, in order to get that higher statutory maximum, requires one of two things. It requires either bodily injury or the use of a deadly or dangerous weapon. So here, the fact that triggers that higher statutory maximum is the bodily injury. When you get to the guidelines, the definition that Judge Keenan referenced earlier for aggravated assault requires serious bodily injury or the involvement of a firearm. And so the language is different in important ways. And although I agree that one of those facts has to be charged and proven to the jury to get to the higher statutory maximum, the court is free, as it did in this case, to apply the guidelines separate from that. But you're saying when the court applied 2A2.2, didn't need the deadly weapon? Bodily injury alone would do it? No, Your Honor, I'm not saying that. The bodily injury would not have been sufficient at sentencing for aggravated assault purposes because the requirement is for serious bodily injury. Whereas when you're talking about the statute 111B, it's just bodily injury. And so the higher statutory maximum is triggered by the busted lip that Officer Siegel incurred during this assault. But I was thinking we moved from .2 to .4 because of the deadly weapon. That's correct. That's what I'm focusing on is how do you get from that one to that because that's a jump from, is it 10 to 14 in terms of the points on it? I mean, that's a big hit. Right, and the language that's important for there is the involvement of a deadly or dangerous weapon. Which leads us to find cases that sort of are in this. I mean, there's a case in which a guy is pointing a gun. There's a case where the gun is in his pocket. He's trying to get to the gun in his own pocket. The best analogy I can think of. But those cases are a little different than a guy who's mentally ill and he's up there scuffling and he says later on, I was trying to get his glove so I could do it. That's not, we don't have any involvement cases like that. Not in this circuit. What this circuit has recognized is that something less than use can constitute an aggravated assault under the guidelines. That's the case law that I was able to find in this circuit. The Fifth Circuit has applied this aggravated assault guidelines provision in a case where there was an attempt to disarm. What case was that? It was the, I believe it's, I want to say Doris. It's cited in our report. Drones case? Drones, yes, sir. That unpublished? That's an unpublished Fifth Circuit case. I haven't found any countervailing authorities. That's a Fifth Circuit unpublished case? And that's the only case I could find that was factually analogous, Your Honor. So the case law, the lay of the land. We don't even like citing our own unpublished stuff. I recognize that, Your Honor. And this is a unique factual circumstance. I don't think we want to do that one. What else you got other than a Fifth Circuit unpublished case? The other cases that we have to rely on there, Your Honor, are the Fourth Circuit cases that allow for something less than use. Which are? And those cases actually arise under 3A1.2, but that incorporates this aggravated assault definition. Those cases, again, I should have probably brought my brief up here, but they're cited in the prior paragraph. You're talking about the Hampton case? Hampton case. Which, again, that's in a slightly different context. That's under 3A1.2. But he was trying to get the gun from his own pocket. Defending that was trying to get his own gun out of his own pocket. That's a whole different ballgame. He has control over that gun. Right. That's right, Your Honor. We don't really have a case that fits this. That's correct, Your Honor. This factual scenario has not been presented in this circuit. But what this circuit has said is that something less than use. Such as? Such as the cases that you were just referring to there, trying to retrieve your own gun. That was the one where he's got it in his own pocket. So he would have possessed it but not used it? Yeah, he's got it right there in his own pocket. He's not controlling this gun. The officer has this gun. This gun is over here. It's there. And all you've got is his later statement that says, I was trying to get his Glock to use it, but when it's going on, he never gets his gun. I mean, he doesn't have any ability to do anything with it. It's just two different sections of the sentencing guide. It doesn't mean he doesn't get a sentence. It's just that it may treat that if you've got a gun, you pointed it at someone. That's surely involvement. And here the district court didn't make some kind of strange kind of statements in here. It seems like the district court said something to the effect that there was not a gun, that the gun wasn't involved. Didn't he use that language? He did, Your Honor. Or did I just pull that out? It says, with no weapon involved by the defendant. He said that. That's correct. He did say that. And when considered in context, that's right after he's just adopted the findings of the pre-sentence report. And what he also says repeatedly throughout that sentencing was that the defendant didn't have the gun when he walked in. And so in light of the district court's findings, and the entire rest of this case and sentencing hearing, the only interpretation that makes sense of that language is what the court said later on, which is that the defendant did not bring the gun in with him. And so I recognize, Your Honor, that taken in isolation, that that would appear to support the appellant's position. But when considered in the context of the trial, this looks like the trial judge is trying to figure this thing out. He knows what he's dealing with, and yet he's got this. PSR starts out with deadly weapon, right at the beginning of this thing. And then he's got all the statements and all. And yet he's trying to nuance this thing because he says, I'm looking at a busted lip, a guy who's mentally ill, who's in there trying to get his medication. Which, by the way, I'm not sure how this all works, but it seems kind of circular when someone who's mentally ill and he can't get his medication, and he's trying to get the medication so he won't do the sort of things he's doing, I assume, but he won't give him his medication. So by not giving his medication, he does those things. There seems to be something wrong with that, doesn't it? The court certainly considered the defendant's mental health in its sentencing. At one point the court actually said this would be a high end of the guideline sentence but for the defendant's mental health. And so the mental health was certainly taken into consideration. Did this arrive from some military type service? There was some indication he had served in the military? He was honorably discharged. And with the bipolar disorder and all those, and he's trying to get his medication, they sent him away. He knows he needs this medication, and without this medication, this sounds like it's the realm of conduct that can result if you don't have the medication. And when he doesn't get it, he does just what he was trying to avoid to do. And that's where it seems like the trial judge is trying to figure this thing out because he's saying that's a long sentence for someone with a busted lip, you know, after all this goes on. I mean, certainly he should get some sentence, but it just seems maybe that .4 fits. And just to respond to your argument's point, the court carefully considered the mental health history. Right out of the gate, his questions were about that. He admitted in the sentencing transcript, the court said, I'm skeptical of these types of cases. But after he heard witness after witness testify to the defendant's actions in attempting to disarm that Social Security Administration officer, the court said, although I was initially skeptical, I'm persuaded by the government. And the district court then sentenced him to the middle of the guidelines, right? That's correct, Judge Sackler. Not the bottom. That's correct. And the court made clear for the record that the mental health factored into its sentence and that but for that issue, it actually would have been at the high ends of the sentence. And just turning back to the 2A2.2 issue, in the absence of controlling authority on the issue from this court, I should say in the absence of the court having addressed this precise issue, we're stuck with the plain language of the guidelines. And in this case, the guideline state involves a firearm. The guidelines drafters know how to use words like use, brandish, and possess. They use the word involve. And so while the aggravated assault guideline can cover, you know, a range of different types of assaults, this assault is within, properly applies the 2A2.2 guideline because it involved a firearm. And that was based on the testimony of eyewitnesses. This wasn't a case, Your Honor, where the court just blindly adopted the pre-sentence report. The government essentially had to try its case in this case and put on eyewitnesses from the Social Security Administration Office who all testified consistently that the defendant made repeated efforts to disarm Officer Siegel. And then we have the defendant's statement after the fact clarifying exactly what his intention was. The Fifth Circuit has a case that is published, I think, the Hooker case. And in that case, the court says the logical conclusion is that this .4 is meant to apply to possessions of weapons and verbal threats, while .2 is meant to apply to something more. I'm not familiar with that case, Your Honor. I know the guidelines speak in terms of merely trying to threaten versus a threatened use. And so I think under... I disagree with that, at least the Fifth Circuit's view on this. At least in terms of how it's set up, .4 is meant to apply to possessions of weapons and verbal threats, while .2 is meant to apply to something more. And I believe we have that something more in this case, Your Honor. Well, in that case, the Hooker case, the defendant pointed a loaded gun at the victim's head while kicking him and trying to kill him. And again, I'm a little unprepared because I'm not familiar with that case, Your Honor. It wasn't cited in the appellant's brief. But we do have that something more here, Your Honor. This was not... The cross-examination tried to portray this as just a scuffle where hands were flying everywhere. That's not what the testimony bore out. All of the eyewitnesses had the distinct impression that the defendant was attempting to grab that firearm and had his hand on the top of the gun at one point was Officer Siegel's testimony. And after the fact, certainly it was after the fact, but the defendant clarified exactly what his intentions were, which was to use that gun to kill Officer Siegel. And so in this case, we would have that something more that perhaps the Fifth Circuit is speaking about in that case. But again, Your Honor, I'm just not familiar with the case... Okay, thank you. ...to fully respond to that question beyond what I've said. And I'll just turn briefly to the motion to withdraw if Your Honor still have any additional questions about the guidelines issue. In this case, the lack of the competency hearing does not render the plea unknowing or involuntary. All of the evidence at the trial, the magistrate judge and district court's observation of the defendant showed him to be competent, and the report conclusively determined that he was competent. After receiving that report, the defendant pled guilty, and he and his attorney both affirmed that he understood the proceedings. Under those circumstances, there's no requirement for a hearing, and the plea is knowing and voluntary. So for those reasons, unless Your Honor has any further questions, the government asks that the court affirm the judgment of the district court. Okay, thank you, Mr. Miller. Roberto, please. Really, the only thing that I could add is that, you know, I still take my position that Judge Cogburn, during the sentencing hearing, did not find the gun as part of what happened during the fight, the fracas, the assault, whatever you want to call it. Did the defendant touch or did he grab the gun? He touched the holster. He said he touched the holster. But not the gun? I remember him saying that he touched the holster. He touched the holster, not the gun. Any other testimony on that? No, and what you have, Judge Winn, is you have... I mean, did the officer say he touched the gun, or did any of the witnesses say he did it? Well, I'm not sure. I want to say that one of them said that he touched the gun. However, you know, this is all going down real fast in the bathroom, and, you know, you've got the witnesses, they're all... they're the Social Security Office witnesses. Throughout the sentencing hearing, you really don't hear from people who are sitting out in the... I mean, I know they weren't in the bathroom, but you don't hear from folks that are sitting out in the lobby. You know, they don't really talk to any of those folks, so you don't really get the other side. You just get the Social Security workers' sides of this. And I would just say, with respect to this, is that, you know, I think that this U.S. attorney, Assistant U.S. Attorney, has done a great job arguing about this gun in the pre-sentence report, but pre-sentence reports are in every one of our cases, and the judges, they might adopt them, but it doesn't mean that they've... that they sentence someone based on every single thing that is in that report, and I would say that he did not sentence him for that gun. It's in Judge Cogburn's own words, and, you know, I think what happened is that he relied on that pre-sentence report, and he got the wrong guideline. He relied that they were under the right guideline, and, you know, it's just... I think justice requires... I mean, that's why y'all are here, to look at what happened there and to remand it back, to vacate it and remand it back, and to... You know, this man's almost ready for credit for time served. It's not a serious injury, and a gun was not involved, and no, I don't have a case because everything I looked at was unpublished or from somewhere else, and I was scared to come here with unpublished... Remand it and send it back and direct the district court to impose the other guideline or to clarify what guideline the court was imposing. To have him sentenced under 2.... 2A2.4. So that he would be... Where he is in the guidelines, it would be, like, 31 to... 33 to 41 months, and he's probably done that. He's been in since December 2011. Thank you. All right, thank you very much. We'll ask the clerk to adjourn court, and then we'll come down to greet the parties.
judges: Barbara Milano Keenan, James A. Wynn, Jr., Stephanie D. Thacker